**UNITED STATES**

v.

**Captain Wayne E. STEWARD,
261–39–1776 FV, United States
Air Force.**

**ACM 27628.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 11 Jan. 1989.

Decided 3 Oct. 1989.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Darla G. Orndorff.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Terry M. Petrie, Lieutenant Colonel Robert E. Giovagnoni and Major Carole W. Hanson.

Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

### DECISION

LEWIS, Senior Judge:

The appellant pleaded not guilty but was found guilty of three drug-related offenses:

wrongful possession of marijuana, wrongful use of marijuana on divers occasions and wrongful possession of various items of drug abuse paraphernalia in violation of a lawful general regulation. He was found not guilty of wrongful possession of cocaine. A charge and specification of homosexual sodomy on divers occasions were withdrawn following a ruling by the military judge that the staff judge advocate's pretrial advice to the convening authority was defective as to that charge and specification. The military judge, sitting alone, imposed a sentence of dismissal, forfeiture of all pay and allowances, confinement for two months, a fine of $10,000.00 and additional confinement of one year if the fine was not paid. The sentence was approved by the general court-martial convening authority. For reasons set forth herein, we reverse.

The appellant, a KC–135 aircraft commander, was summoned to the Office of Special Investigations (OSI) following the receipt of unspecified information that he had used marijuana. Agent C. conducted the questioning of the appellant. He was assisted by Staff Sergeant (SSgt) J., a security police investigator. Agent C., in his testimony at trial, acknowledged that he conducted what is known as a "wing and a prayer" interview. He explained that this description means that the interrogator has no reliable evidence of an offense at his disposal and must "say a prayer and go in and wing it."

■ After the appellant reported to the OSI office and had waited alone for several minutes, he was approached by Agent C. The substance of C.'s initial remark to the appellant was summarized by the military judge, in one of his essential findings of fact, as follows: " 'Wayne, from this point on you are grounded. You can either cooperate with us and try to get your wings back or lose your wings forever', or words to that effect." The appellant was then advised that he was suspected of using marijuana and was provided a full rights advisement. *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). The appellant acknowledged his understanding of the rights. He agreed to submit to an interview and declined the services of counsel.

It was the agent's remark to the appellant prior to the rights advisement that raises the legal issue in this case. We accept as a given factor that the remark created a presumptive taint with respect to incriminating statements subsequently provided by the appellant. This conclusion is compelled by our understanding of the Court of Military Appeals' analysis in *United States v. Byers*, 26 M.J. 132 (C.M.A. 1988), and is otherwise implicit in the findings and conclusions of the military judge.

We shall explore certain key aspects of the interview following the rights advisement in our subsequent discussion. For the moment, we shall merely summarize the highlights of what transpired. While the appellant initially denied wrongful involvement with marijuana, he certainly did not alleviate suspicion when he readily acknowledged that his wife used marijuana occasionally. About 20 minutes after the interview commenced, at Agent C.'s suggestion, he consented to a urinalysis and a search of his car, although he declined to consent to a search of his quarters. After signing the requisite consent forms, the appellant remarked to SSgt J. that the urinalysis "should come back clean," or words to that effect. When SSgt J. queried him closely about his use of the word, "should," the appellant relented and admitted that he and his wife had used marijuana a few days previously. He signed a written statement admitting a recent use of marijuana with his wife in their home. A warrant to search the appellant's off base quarters was obtained from a civilian magistrate, with probable cause presumably based on his admission.

The search of the appellant's vehicle did not disclose any items of evidentiary value. The search of the quarters resulted in the discovery and seizure of various items of marijuana paraphernalia. Later the same day the appellant admitted to more extensive and frequent uses of marijuana and signed a statement to that effect. The result of the urinalysis, received sometime

afterwards, reflected the presence of the marijuana metabolite at a positive level.

The defense moved to suppress the appellant's pretrial admissions because they were obtained in violation of Article 31(b), UCMJ, 10 U.S.C. § 831(b). This provision is basic to our investigative process, but it bears quoting, with appropriate emphasis, at this point:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without *first* informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

(Emphasis added.) The defense contention, with which the military judge agreed, was that Agent C. violated this provision by beginning his interrogation prior to providing a rights advisement.

In his limited testimony in support of the motion to suppress, the appellant claimed that he incriminated himself because "finally he [apparently referring to Agent C.] convinced me that maybe there was a chance I could get my wings back if I was honest and up front with them. And my wings were everything, they're everything I've ever worked for." The appellant testified that during the course of the interview Agent C., himself a former pilot, had expressed empathy for his situation and the concern that he might lose his wings. According to the appellant, C. explained that when the case was presented to the wing commander it would make a difference whether he was able to report that the appellant had told them everything they wanted to know, "or if I was being an ass and I was trying to lie my way out of it." Agent C. testified that he could not recall talking about flying status during the interrogation, but he acknowledged that some mention of his own past flying status

might have occurred. He also acknowledged that he advised the appellant that his cooperation would be noted and passed on to the wing commander. SSgt J.'s recollection, according to his testimony, was that any reference to flying status, including Agent C.'s former flying status, occurred prior to, but not after, the rights advisement.

The military judge resolved the somewhat contradictory testimony of the principals in his essential findings of fact, which are quoted in pertinent part:

> At some time during the remainder of the interview, Special Agent [C.] told Captain Steward that he, Special Agent [C.], knew how important Captain Steward's wings were to him because he, [C.], had been a pilot and had lost his wings too, or words to that effect.

> Special Agent [C.] also repeatedly told Captain Steward words to the effect that the accused's conduct during the interview would be reported and this report would include a report as to whether or not the accused cooperated and whether or not the accused lied as the case may be. Whatever the conduct was during the interview, it would be reported to [the wing commander] who the accused believed at that time, would be the decision maker as to his flying status.[1]

The military judge, as previously noted, concluded that Agent C. had engaged in an interrogation by his comment to the appellant prior to a rights advisement. However, citing the Court of Military Appeals' opinion in *United States v. Byers*, he concluded further "that it did not create a presumptive taint so great that it could not be cut off by a rights warning as well as the other facts and circumstances of this case." *See* 26 M.J. at 135. Other facts and circumstances relied upon by the military judge in concluding that Agent C.'s pre-advisement inducement had not tainted the appellant's subsequent admissions were the following: (1) the appellant's age, intelligence, education, and Air Force experi-

---

**1.** The witnesses, particularly appellant, spoke of wearing wings and serving on flying status as if they were interchangeable concepts. Based on certain questions from the bench, it appears to us that the military judge appreciated the distinction between the two concepts.

ence; (2) the relaxed atmosphere in the interview room; (3) the appellant's acknowledgement, in response to a leading question by the military judge, that he agreed to the interview following the rights advisement because he believed he could satisfy the agent's curiosity without incriminating himself, and (4) the appellant's response to another question of the military judge that he had admitted his involvement with marijuana when he realized that there was no use in lying any longer.

■ We accept the military judge's essential findings of fact. We do not accept his conclusion, based on the facts, that the rights advisement was sufficient to erase the taint of Agent C.'s introductory remark: "Wayne, from this point on you are grounded. You can either cooperate with us and try to get your wings back or lose your wings forever," or words to that effect. We find that the military judge erred in denying the defense motion to suppress the appellant's incriminatory statements.

In *Byers*, the investigator spoke to the accused at some length prior to providing a rights advisement. Among other things, the investigator in that case stated to the accused that:

> .... there was no doubt in my mind that he had used marijuana, but he would have to face the situation by cooperating with the Government in the form of making a full admission and possibly providing a signed, sworn statement or he had the option of leaving the interview room at any time.

26 M.J. at 133–134. The Court, in concluding that this statement constituted interrogation, cited *United States v. Borodzik*, 21 U.S.C.M.A. 95, 44 C.M.R. 149, 151 (1971): "When conversation is designed to elicit a response from a suspect, it is interrogation, regardless of the subtlety of the approach." 26 M.J. at 134. The Court concluded, nonetheless, that the investigator's improper preamble had not created a presumptive taint so great that it could not be cut off by a rights warning. The violation of Article 31(b) was one circumstance to be considered along with all others in determining whether the appellant's resulting post-advisement statements were voluntary. *Id.* at 135.

In the case at hand we conclude that the taint of Agent C.'s remark was not erased by the rights advisement. Indeed, it was reinforced throughout the course of the interview by C.'s sympathetic reference to his own prior experience as a pilot and, more importantly, references to the report to be made to the wing commander of Captain Steward's "conduct" during the interview. We cannot avoid facing the reality that a trained interrogator (particularly one engaged in a "wing and a prayer" interview) has to hope above all else that a suspect will talk, only if to deny any wrongdoing. See the discussion of interrogation techniques in *United States v. Whitehead*, 26 M.J 613, 618–619 (A.C.M.R. 1988). An interrogator, however, is not entitled to do so by enticing "cooperation" prior to a rights advisement and, subsequently, reinforcing such improper enticement. This is clearly what occurred in the case at hand.

The military judge in stating his conclusions recognized that the appellant was probably motivated in his unsuccessful attempt to alleviate suspicion of marijuana involvement by an inner compulsion to continue on flying status. He noted that the Court of Military Appeals has held that exploitation of a suspect's inner compulsion known by investigators does not, in and of itself, render the suspect's admissions involuntary. *United States v. Robinson*, 26 M.J. 361 (C.M.A.1988) (accused's pathological need to discuss crimes that had been committed). This principle of law is not dispositive of the issue before us, in our view. The Court, in *Robinson*, 26 M.J. at 367, cites an earlier opinion which develops this particular issue in further detail and is more instructive in the situation before us. In *United States v. Wheeler*, 22 M.J. 76 (C.M.A.1986), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986), the accused argued that his admissions of committing sexual crimes were improperly induced by appeals to his deeply held religious beliefs.

The *Wheeler* Court rejected the accused's contention, but, in doing so, distinguished Wheeler's situation from that of Captain Steward in four separate particulars. 22 M.J. at 78. First, Wheeler had testified at trial that his confession was induced by a promise of psychiatric assistance. His failure to mention an appeal to religious convictions indicated that such appeal had only a minor impact. Captain Steward, on the other hand, has not urged that any other underlying concern prompted him to conduct himself as he did during his interrogation. Secondly, Wheeler voluntarily waived his Article 31 rights and consented to answer questions before the question of religion was mentioned. In view of our prior discussion, this is a compelling distinction by itself. Thirdly, Wheeler himself injected the subject of religion into the interview, not the interrogators. This distinction is also obvious and compelling based on our prior discussion. Fourthly, the appeal to Wheeler's religious beliefs, when it was made, was general in nature and was in the form of an appeal to his conscience. This is not as clear a distinction from the case at hand. However, we note that while Agent C. spoke of the appellant's and his own flying status in somewhat general terms, he purported to offer hope of a tangible benefit to the appellant, restoration to flying status. In the case before us, the pre-advisement appeal to the appellant's compulsion to continue flying constituted an improper inducement.

In acknowledging that he became convinced that there was no use in continuing to lie to Agent C. and SSgt J., the appellant was doing no more than conceding that his resolve to "stonewall" the situation had been overcome by the talents of trained interrogators. The primary question before us is whether the appellant was encouraged to follow the questionable, and shortlived, strategy of "stonewalling" rather than relying on his right to remain silent or seeking the advice of counsel by the carrot skillfully placed before him before

the interview commenced. The key is that Captain Steward elected to talk to the investigators, however untruthfully at first, rather than asserting his Article 31 rights. Nothing in the appellant's testimony overcomes the premise that, in so doing, he was attempting to preserve his flying status, however irrational that expectation might seem in retrospect.[2] The fact that the appellant, at a rather early time in the interview process, realized there was no use in continuing to lie does nothing whatsoever to separate him from any other suspect under interrogation who recognizes at some point in an interview that the game is up.

There is one nagging factual issue that we cannot clearly answer from the record before us. Has the appellant cleverly contrived an issue that did not exist in fact at the time of the interrogation? In short, how much credit should we give to the appellant's assertion that he felt compelled to "cooperate" with Agent C. in the hope that he might either remain on or be restored to flying status? The trial counsel cross-examined the appellant in some detail during the motion to suppress and skillfully suggested that Captain Steward could not have rationally supposed that he had any realistic opportunity of saving his flying career, notwithstanding what Agent C. implied. It is always difficult for appellate reviewers to attempt to view a situation through the eyes of one who suddenly becomes a criminal suspect. We assume that Agent C. is an individual well versed in the psychology of the interrogation room. The fact that he found it worthwhile to display a carrot to the appellant at the outset of the interview indicates a belief on his part that this was a useful step in the interrogation process. It appears somewhat disingenuous for the Government to now claim that it was a meaningless and ineffective enticement. A suspect, even an educated and experienced officer, might well not react in the same manner in the interrogation environment as he would after an op-

---

**2.** The bottom line, as we see it, is that the appellant waived his right to remain silent by opting to manifest "cooperation."

portunity for calm reflection. We find nothing in the record to discredit the appellant's account that he was unduly influenced by C.'s inducement.

More importantly, we find no indication that the military judge, who directly observed the appellant's testimony and demeanor, rejected Captain Steward's account out of hand. Quite the contrary. In a prelude to his discussion of the *Robinson* case, he stated, "Now, I recognize that the accused may well have been motivated to make the statements by the desire to save his wings, and that this inner desire on the part of the accused may well have been known to the interrogators." Thus, it appears that the military judge gave some credence to Captain Steward's account of his thought process during the interrogation process. Given the record before us, we have no basis for concluding that the appellant's concern and belief respecting his future flying status was other than genuine.

█ The military judge properly noted that an interrogator may exploit a suspect's inner desire or motivation when it becomes apparent. However, as our discussion of *Wheeler* reveals, this case involves more than an opportune exploitation. The interrogator first planted the motivational seed prior to a rights advisement. As *Byers* suggests, this form of psychological manipulation is not permitted. We suspect that the appellant would have been motivated to save his flying career in any event. However, we have no basis for concluding that he would have imagined it feasible to do so by "cooperating" with the interrogators in the absence of the pre-advisement inducement, as reinforced following the advisement.

We conclude that the military judge correctly denied a separate motion to suppress the result of the urinalysis. However, we note that this motion was based on a narrower factual issue than we have addressed herein; that is, whether the appellant's consent to provide urine was prompt-

ed by advice that if he did not consent his commander would direct that he do so. *See United States v. White*, 27 M.J. 264 (C.M.A.1988). While the record is not absolutely clear in this respect, we construe the military judge's ruling to have been premised on this issue alone. We do not reach the issue of the validity of the probable cause search of the appellant's premises, as that issue was not specifically addressed at trial in light of the military judge's ruling denying the suppression of the appellant's pretrial admissions.

█ The appellant was found guilty, among other offenses, of wrongful use of marijuana on divers occasions. In addition to evidence of the positive urinalysis the military judge considered the appellant's pretrial admissions [3] and evidence that marijuana paraphernalia was seized from his quarters. We are not persuaded that the appellant would have been found guilty of any portion of this particular specification, e.g., a single wrongful use of marijuana, based on the positive urinalysis standing alone. We conclude that no portion of the findings of guilty may stand.

The findings of guilty and sentence are set aside. A rehearing may be ordered.

Senior Judge KASTL concurs.
Senior Judge Lewis authored this opinion before his retirement.

Judge BLOMMERS (dissenting):

Initially, I question whether, under the circumstances present, Agent C.'s remarks prior to the rights advisement constitute "interrogation" or the functional equivalent thereof as contemplated by the Article 31(b) of the Uniform Code and developed military case law. Or, even if they did, that what Agent C. said was an impermissible inducement, as the majority so finds. Although the participants present during the interview gave different accounts of precisely what was said, I accept the military judge's finding of fact that Agent C. stated: " 'Wayne, from this point on you

---

**3.** Our holding today should not be construed as precluding the trial counsel in a rehearing from attempting to establish that the appellant's sec-

ond statement is admissible. This matter is open to further litigation based on our opinion.

are grounded. You can either cooperate with us and try to get your wings back or lose your wings forever,' or words to that effect." *United States v. Middleton,* 10 M.J. 123, 133 (C.M.A.1981); *United States v. Jenkins,* 24 M.J. 846, 848 (1987).

The statement could be viewed as little more than an administrative *fait accompli,* that should have been recognized as such by the appellant the instant he was advised of the nature of the investigation, i.e., use and possession of illegal drugs.[1] Substantiated drug abuse medically disqualifies a rated officer from flying duties. Air Force Regulation 160–43, *Medical Examinations and Medical Standards,* para. 7–27b (24 October 1986). Such abuse "automatically places ... [a] member's continued service in jeopardy." AFR 30–2, *Social Actions Program,* para. 3–2b (18 April 1986). For officers, it will almost always result in the initiation of administrative separation (if not punitive) proceedings. AFR 36–2, *Administrative Discharge Procedures,* para. 3–7c (Change 3, 1 June 1988)—previous regulation dated 1 October 1984 contained the same provision. At trial, the appellant acknowledged that he knew drug abuse was not tolerated in the Air Force and that it usually resulted in a servicemember being discharged. Yet, he testified that he confessed to using marijuana because "finally he [Agent C.] convinced me that maybe there was a chance I could get my wings back if I was honest and up front with them. And my wings were everything, they're everything I've ever worked for." In today's Air Force I find it incredible that any rated officer, who admits while under investigation to the illegal use of drugs, would think that he would be returned to flying status at any time in the foreseeable future, let alone that he would be retained in the service.

Moreover, the situation here is considerably different factually than that faced by the Court of Military Appeals in *United States v. Byers,* 26 M.J. 132 (C.M.A.1988). In *Byers,* the agent involved talked to the suspect for between 20 and 40 minutes before providing a rights advisement. Among matters contained in this lecture were statements by the agent that in light of a positive drug urinalysis he had no doubt whatsoever that the suspect had used marijuana, and that he would have to face the situation "by cooperating with the Government in the form of making a full admission ..." *Id.* at 133. The Court of Military Appeals concluded:

> Article 31(b) contemplates that the rights warning should be given when an interrogation begins—not at its midpoint. Fleshman [the agent] himself described the 20 to 40 minute interview as "the first part of our *interrogation*" (emphasis added); and so by his own testimony, he has admitted noncompliance with Article 31(b). Moreover, Fleshman's statement to appellant that the urinalysis had been positive and that "there was no doubt in my mind that he had used marijuana, but he would have to face the situation by cooperating with the Government in the form of making a full admission and possibly providing a signed, sworn statement" is akin to telling a suspect that he has been implicated by someone else—which we have held to be "interrogation." (Citations omitted.)

*Id.* at 135. In the present case, two agents walked into the interview room where the appellant was seated; one made the statement quoted earlier, to which the appellant testified he asked, "Why?" The agents then immediately identified themselves, displayed their credentials, provided him a full rights advisement (Article 31(b) and his right to counsel), and obtained his waiver thereof. According to the OSI Interview

---

1. Agent C. testified that before the rights advisement he did tell Captain Steward that he was grounded, and that they had an allegation they wanted to clear up and would like his (Captain Steward's) cooperation in doing so so he could get back on flying status. He told Captain Steward he was grounded "to heighten his awareness to get him serious about the interview." Agent C. stated that he knew from his earlier discussion with Colonel Stampfli (the Wing Commander) that the allegation was serious enough that they were going to ground Captain Steward until the allegation was cleared up. Captain Steward testified that he knew it was Colonel Stampfli who would make the decision about his flying status, not the OSI.

Record (AFOSI Form 73 (Jul 83)), this whole process took three minutes.

However, for the purposes of the remainder of this analysis, I will accede to the position taken by my senior brothers—that the agent's initial remarks constituted improper interrogation. As Senior Judge Lewis notes, the Court in *Byers* held: "... noncompliance with Article 31(b) was one circumstance to be considered along with others in determining whether the statements made by appellant after receiving a warning were voluntary." *Id.* My brothers conclude that the taint of Agent C.'s initial statement was not erased by the rights advisement, but reinforced by his subsequent "sympathetic reference to his own prior experience as a pilot," and "references to the report to be made to the wing commander of Captain Steward's 'conduct' during the interview." I view Agent C.'s reference to the fact that he had been a pilot and lost his wings as nothing more than a good investigative technique of moment, designed to gain a psychological advantage. *Cf. Miranda v. Arizona,* 384 U.S. 436, 449, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The fact that the results of the interview would be reported to the wing commander is another *fait accompli.* The appellant acknowledged that he knew the wing commander was the key decision maker with regard to his flying status. Obviously that commander, the one who has ultimate responsibility for accomplishment of the flying mission at his installation, would be briefed on the status of the investigation. Key commanders are routinely so briefed.[2]

Thus, I cannot conclude that the conduct of the investigators involved in this case rendered the appellant's inculpatory statements involuntary. Additional facts found by the military judge, and supported by evidence of record, buttress this conclusion: (1) the appellant initially agreed to talk with the investigators in hopes of satisfying their curiosity about the allegation without incriminating himself; (2) he was an adult with several years experience in the military and in good health and mental condition; (3) the interview was conducted in a relaxed, nonthreatening atmosphere; and, (4) the appellant's testimony that he made the admission because there was "no sense lying any more." My reading of the record convinces me that he confessed because "the jig was up," not because his will was worn down by skilled investigators who convinced him that if he cooperated and admitted his wrongful use of drugs he had a chance to get his "wings" back. *See* Article 31(d), UCMJ; *United States v. Robinson,* 26 M.J. 361, 367 (C.M.A.1988); *United States v. Wheeler,* 22 M.J. 76 (C.M.A. 1986); Mil.R.Evid. 304(c)(3). I note that only 14 minutes into the interview a break was taken. When it resumed seven minutes later, the appellant consented to give a urine sample and permit the search of his car.[3] Very shortly thereafter he admitted he had used marijuana together with his wife a few days before. He knew what urinalysis testing would reveal.

In an unrelated assertion of error, it is contended that the trial court's imposition of a fine is inappropriate in this case. It is pointed out that there is no evidence of unjust enrichment. I would not conclude that the imposition of a fine is inappropriate. However, a question arises as to whether the convening authority could legally approve the contingent confinement portion of the sentence as it related to the fine. Earlier decisions by this Court would tend to indicate that he could not, since the sentence to confinement had already been served by the time the convening authority took his action. *See United States v. Arnold,* 27 M.J. 857 (A.F.C.M.R.1989); *United States v. Carmichael,* 27 M.J. 757 (A.F. C.M.R.1988); *United States v. Gerdes,* 27 M.J. 587 (A.F.C.M.R.1988). As I noted in a concurring/dissenting opinion a few

---

**2.** Any case involving preferral of court-martial charges against an officer must be reported through channels to Headquarters, USAF. AFR 111–1, *Military Justice Guide,* para. 2–4 (30 September 1988). The Air Staff is kept appraised of the status of each case.

**3.** The defense moved to suppress the results of the consent urinalysis at trial on the same ground as that raised in *United States v. White,* 27 M.J. 264 (C.M.A.1988). The military judge denied the motion. This ruling is not challenged on appeal.

months ago in an unpublished decision (*United States v. Shada*, ACM 27432, 1989 WL 76349 (1989)), I do not agree with the holdings reached in those cases. *United States v. Sarea*, 9 C.M.R. 633 (A.F.B.R. 1953). *See also United States v. Garcia*, 5 U.S.C.M.A. 88, 17 C.M.R. 88 (1954); *United States v. DeAngelis*, 3 U.S.C.M.A. 298, 12 C.M.R. 54 (1953); *United States v. Larson*, 45 C.M.R. 894 (N.M.C.M.R.1972); R.C.M. 1003(b)(3), 1003(b)(8); MCM, 1969 (Rev.), para. 126h(3); MCM, 1951, para. 126h(3).

I would affirm the approved findings of guilty and the sentence.